```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
BRAD CROSBY & RICHARD DANIELS,           )
                                         )         09 Civ. 9693 (SAS)
                          Plaintiffs,    )
                                         )
              -against-                  )
                                         )
THE CITY OF NEW YORK, et al.             )
                                         )
                          Defendants.    )
------------------------------------------------------------X
LUIZ CARLOS REIS,                        )
                                         )         09 Civ. 9694 (SAS)
                          Plaintiff,     )
                                         )
              -against-                  )
                                         )
THE CITY OF NEW YORK, et al.             )
                                         )
                          Defendants.    )
------------------------------------------------------------X
PAUL RICHARDSON,                         )
                                         )         09 Civ. 9695 (SAS)
                          Plaintiff,     )
                                         )
              -against-                  )
                                         )
THE CITY OF NEW YORK, et al.             )
                                         )
                          Defendants.    )
------------------------------------------------------------X
```

### PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO THE DISTRICT ATTORNEY OF NEW YORK COUNTY'S MOTION TO QUASH SUBPOENAS

> MICHAEL L. SPIEGEL
> 111 Broadway, Suite 1305
> New York, New York 10006
> (212) 587-8558
> Attorney for Plaintiffs

Dated: April 12, 2010

**TABLE OF CONTENTS**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

APPLICABLE LAW AND SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    Point I:   The Official Corruption Unit Investigation Documents Must be Produced or
              Submitted for *In Camera* Inspection by the Court. . . . . . . . . . . . . . . . . . . . . . . . . 9

        A.   The List of Nineteen Names and the Corresponding Case Files . . . . . . . . . . 10

        B.   Three Fax Cover Sheets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        C.   The DANY Memorandum on the Results of the Official Corruption Unit
              Investigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    Point II:   The Trial Division Investigation Documents Must be Produced, Redactions to
              Produced Documents Must be Removed, or the Documents Must be Submitted
              for *In Camera* Inspection by the Court. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        A.   The Documents Which Have been Produced Must Have Certain Redactions
              Removed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        B.   The Withheld Documents Must be Produced to Plaintiffs, or to the Court for
              *In Camera* Inspection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    Point III:   Documents from the Plaintiffs' Criminal Case Files . . . . . . . . . . . . . . . . . . . . . 16

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

# **TABLE OF AUTHORITIES**

CASES

Abdell v. The City of New York, 2006 U.S. Dist. LEXIS 66114 (S.D.N.Y. Sept. 14, 2006). . 7, 13

Cody v. N.Y.S. Div. of State Police, 2008 U.S. Dist. LEXIS 59095 (E.D.N.Y. July 31, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Cruz v. Kennedy, 1997 U.S. Dist. LEXIS 23012 (S.D.N.Y. Dec. 19, 1997) . . . . . . . . . . . . . . . . 8

Gentile v. The County of Suffolk, 926 F.2d 142 (2d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . 13, 14

Hickman v. Taylor, 329 U.S. 495 (1947) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Kelly v. City of San Jose, 114 F.R.D. 653 (N.D.Cal. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

King v. Conde, 121 F.R.D. 180 (E.D.N.Y. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 10

Martinez v. Port Auth., 2005 U.S. Dist. LEXIS 19141 (S.D.N.Y. Sept. 2, 2005), *aff'd*, 445 F.3d 158 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Miranda-Ortiz v. Deming, 1998 U.S. Dist. LEXIS 17147 (S.D.N.Y. Oct. 29, 1998) . . . . . . . . 14

Monell v. Department of Social Services, 436 U.S. 658 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . 1

RULES

F.R.Civ.P. 26(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Fed. R. Evid. 803(8)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**INTRODUCTION**

Plaintiffs are four men who were arrested on prostitution charges by undercover police officers of the Manhattan South Vice Enforcement Squad ("MSVES"). The plaintiffs were arrested at two businesses that had been targeted by MSVES – a store selling sexually explicit materials, condoms and sexual aids (Unicorn DVD), and a spa (Miracle Spa). Three of the four plaintiffs explicitly rejected the undercover officers' proposals to exchange sex for money; the fourth plaintiff never had a discussion with the officer about sex or money. Plaintiffs allege that the City of New York had a practice or policy of falsely arresting men perceived to be gay on charges of prostitution to support nuisance abatement lawsuits brought by the City to close the businesses where they were arrested. Monell v. Department of Social Services, 436 U.S. 658 (1978); Martinez v. Port Auth., 2005 U.S. Dist. LEXIS 19141 (S.D.N.Y. Sept. 2, 2005), *aff'd*, 445 F.3d 158 (2006) (upholding a jury verdict finding that arrests of men in a bathroom at a Port Authority facility were "an unconstitutional policy or practice that resulted in a deprivation of the plaintiff's constitutional rights by arresting men perceived to be gay, or arresting men without probable cause").

The arrests of a large number of men who either alleged that they had been falsely accused of prostitution, or who appeared on the face of public records to be extremely unlikely prostitutes, came to light when one of the arrestees took his story to a reporter for Gay City News, a local media outlet serving the gay community. The articles about the arrest of Robert Pinter, who was 52 years old, and other unlikely male "prostitutes" (including tourists visiting New York City), led to community meetings and calls for an investigation by City Council Speaker Christine Quinn, State Senator Thomas Duane, State Assemblyman Richard Gottfried,

State Assemblywoman Deborah Glick, City Councilwoman Rosie Mendez, other public officials, and concerned community organizations.  (*See*, Declaration of Michael L. Spiegel in Opposition to District Attorney for New York County's Motion to Quash Subpoenas (hereinafter, "Spiegel Decl.") at ¶3 and Exhibits A and B.)[1]

As a result of the public outcry from the gay community, on March 6, 2009, DANY met with community representatives and announced that it was conducting an investigation into the arrests by MSVES.  (Exhibits A and B to Spiegel Decl.)  As a result, numerous criminal cases were subsequently dismissed, including plaintiffs' cases.  (Exhibit C to Spiegel Decl.)  Upon filing these civil rights cases, plaintiffs served subpoenas on DANY seeking records relating to plaintiffs' individual cases, and records relating to the investigation by DANY into the arrests of men for prostitution by MSVES.  (Exhibit D to Spiegel Decl.)  This Court subsequently directed DANY to file a motion to quash, to the extent that they objected to producing the documents demanded by the subpoenas.  (Exhibit E to Spiegel Decl.)

DANY has produced most of the records concerning plaintiffs' individual cases, but has withheld a substantial number of relevant documents created or accumulated in the course of two separate investigations conducted by two DANY units.  These documents are relevant to plaintiffs' Monell claim; they are not protected by any applicable privilege; and appropriate redactions to produced documents will adequately protect the privacy of non-plaintiffs who were arrested by MSVES.

---

[1] Exhibit A is a document which was produced by the District Attorney for New York County ("DANY") in response to plaintiffs' subpoenas.

**BACKGROUND**

These cases involve a City program to pursue nuisance abatement lawsuits against businesses by making arrests of men for prostitution at the business sites, then using the fact of those arrests to attempt to close the businesses. In Crosby & Daniels and Richardson, the business was the Unicorn DVD store, which sold sexually explicit materials, condoms and sexual aids. In Reis, it was the Miracle Spa.

Plaintiffs allege that defendants "initiated, designed, approved, supervised, and/or implemented the program pursuant to which [plaintiffs were] wrongfully arrested and prosecuted." Crosby & Daniels, Amended Complaint, ¶14; Reis, Amended Complaint, ¶10; Richardson, Amended Complaint, ¶10. Plaintiffs allege that the City, through the NYPD Legal Bureau and the Mayor's Office of Special Enforcement, made coordinated efforts to shut down businesses perceived to be nuisances by bringing lawsuits in New York State courts. These lawsuits were supported by arrests for prostitution by MSVES at the subject businesses. For example, the arrests of plaintiffs Crosby, Daniels and Richardson, and two other men, were listed in affidavits in support of the City's lawsuit to close the Unicorn DVD store, New York City v. Blue 8 Realty LLC, 400086/09 (Exhibit F to "Spiegel Decl."). That case was filed on January 14, 2009, and voluntarily dismissed by the City less than two weeks later (Exhibit G to Spiegel Decl.).[2] The arrest of plaintiff Reis was listed in an affidavit in support of the City's lawsuit to close Miracle Spa, New York City v. Ista Holding Co., 401271/08 (Exhibit H to Spiegel Decl.). That lawsuit was disposed of by a stipulation in which the business agreed to close (Exhibit I to

---

[2]A search of state court databases has turned up no nuisance abatement lawsuit based upon arrests of men for prostitution by MSVES at businesses selling sexually-oriented materials after the Blue 8 Realty case. (Spiegel Decl. at ¶8.)

Spiegel Decl.).

Plaintiffs allege that the defendants directed, participated in, and approved of a program to arrest men perceived to be gay for prostitution at the targeted businesses without probable cause. Based upon review of the files of Blue 8 Realty LLC, Ista Holding Co., and other nuisance abatement lawsuits, plaintiffs have identified 43 prostitution arrests of men listed in eight lawsuits in 2008. (Spiegel Decl. at ¶10.) The affidavits in support of the nuisance abatement lawsuits listed *arrests*, they did not allege that the men had been *convicted*, and indeed, many of the men listed in the affidavits were never convicted (including the plaintiffs). Arrests, even if later dismissed, were sufficient to support the lawsuits.

Undercover officers UC#3371 (in Crosby & Daniels and Reis) and UC#31107 (in Richardson) alleged that plaintiffs agreed to accept money in exchange for sex. Plaintiffs Crosby, Daniels and Richardson claim that they absolutely rejected the offers of money by the undercover officers, and attempted to disengage from any further conversation, but were arrested nonetheless. Crosby & Daniels, Amended Complaint, ¶¶9 and 12; Richardson, Amended Complaint, ¶9. Plaintiffs Crosby and Daniels were separately arrested after being approached by UC#3371 inside the Unicorn DVD store on September 28, 2008. The two arrests occurred within less than an hour of each other. A third man was arrested a half hour later, also by UC#3371. None of the three men had ever met until they were in handcuffs inside the same police van. Plaintiff Richardson was arrested on October 8, 2008, after being approached by UC#31107 in the same store. He, too, was joined by a stranger in the police van who was arrested in the store. (Spiegel Decl. at ¶11.)

Plaintiff Reis had responded to a classified ad in a Portuguese language newspaper

4

offering part-time employment at a spa.  When he went to the spa, he filled out an employment application; in it, plaintiff Reis wrote that he did not know how to do a massage, that he was not comfortable massaging people, and that he was not licensed to perform a massage.  He applied for a job as "receptionist" or "driver."  After what he believed to be a brief interview in which the only question was whether he was Brazilian, he returned to the waiting room, where he was sitting when police burst in and arrested him and two other men.  (Spiegel Decl. at ¶12.)

Plaintiffs Crosby and Daniels were 34 years old, plaintiff Richardson was 37 years old, and plaintiff Reis was 38.  Crosby is a management-level employee of a firm which provides concierge and security services to high-end cooperative and rental apartment complexes; Daniels is a regional manager for the Krispy Kreme Donut Company; Richardson is employed in a kosher food processing facility; and Reis works for Japan Air Lines at JFK airport.  None have ever been arrested for prostitution.  (Spiegel Decl. at ¶13.)  In these significant respects, they are obviously unlikely prostitutes.

Plaintiffs are similar to most of the 23 currently-identifiable men arrested by UC#3371and UC#31107 for prostitution in 2008.  Nineteen of those 23 men were over thirty years old at the time of their arrest – eight were over the age of forty, and one was 52 years old.  (Spiegel Decl. at ¶14.)  Given our society's cultural norms, it would be striking that older prostitutes have become predominant.  (It is important to understand that the arrested men were not arrested for *patronizing* an undercover officer posing as a prostitute, they were arrested for *being* prostitutes.)  An analysis of arrests of men for prostitution made by other undercover officers in MSVES in support of nuisance abatement lawsuits shows the same pattern.  (Spiegel Decl. at ¶14.)

DANY's motion to quash seeks to prevent production of numerous documents created or accumulated during the investigations into arrests by MSVES which were conducted by the DANY's Trial Division and its Official Corruption Unit.[3]  Many of these documents are from cases which were either dismissed by the prosecutors, or were resolved by non-criminal, non-prostitution-related pleas to minor violations.  These dismissals were a direct result of the DANY investigations, according to DANY.  (Exhibit C to Spiegel Decl.)  The fact that DANY dismissed a large number of criminal cases is strong support for plaintiffs' <u>Monell</u> claim that there was a practice, policy or custom of making false arrests, and that it was not simply the result of individual "rogue" police activity.

In these cases, the undercover officers plainly alleged sufficient facts – which plaintiffs claim are fabrications – to support prostitution offenses.  For example, attached are the

---

[3]The nature of these investigations, and DANY's motion to quash, have been the subject of public statements released to the media and community organizations within the gay community.  (Exhibit C to Spiegel Decl.)  These statements have raised more questions than they have answered.  For example, an official statement released on March 31, 2010, by Erin Duggan, Communications Director for Manhattan District Attorney Cyrus R. Vance, Jr., stated that "[s]ome of the numerous interviews conducted during this investigation did not result in documents responsive to the civil document request [in this case] answered this week by the Office [of the District Attorney for New York County]."
  If, in fact, there are documents concerning "interviews conducted during this investigation" which DANY believes are not "responsive" to plaintiffs' subpoenas, then they are obviously required to disclose those documents in the form of a "privilege log."  None of the documents listed in the motion to quash, however, reference any interviews of law enforcement personnel.
  The DANY press statement also states that "[i]t would be grossly misleading to consider in isolation a response to a civil document request and presume that it is a complete account of the investigation – it is not."  This statement is inexplicable, given the breadth of plaintiffs' subpoenas.  In light of DANY's initial position that plaintiffs' subpoenas were "overbroad," it is simply impossible to reconcile such a statement with the scope of plaintiffs' subpoenas.  If DANY's reply papers on this motion do not adequately explain these statements, plaintiffs respectfully request that the Court conduct a hearing to determine whether the universe of materials responsive to plaintiffs' subpoenas has been disclosed.

Complaint Follow Up Reports created by undercover officers UC#3371 and UC#31107 to support the criminal charges brought against the four plaintiffs. (Exhibit J to Spiegel Decl.) Nonetheless, the charges were dismissed as a result of the DANY investigation. Furthermore, police records indicate that the undercover officers were wearing radio transmitting devices at the time that they claim they were engaging in criminal agreements to engage in prostitution. (Spiegel Decl. at ¶16.) Therefore, other officers, including supervisory officers, could hear those conversations. Despite these multiple police witnesses to alleged criminal violations of the prostitution law, the cases were dismissed by the prosecutors, or the accused were permitted to plead to minor non-criminal offenses which resulted in sealing of their records. If, in fact, DANY determined that the conversations did not take place as alleged in the police and prosecuting documents, that information is relevant to plaintiffs' Monell claim.

## APPLICABLE LAW AND SUMMARY OF ARGUMENT

The universe of documents subpoenaed by plaintiffs fall into three categories: (a) documents related to the criminal cases brought against the four plaintiffs; (b) documents generated or collected during an investigation into MSVES by DANY's Trial Division; and (c) documents generated or collected during an investigation into MSVES by DANY's Official Corruption Unit.

DANY has broadly asserted that most of the documents are work product, relying upon F.R.Civ.P. 23(b)(3). It is well-established that Rule 23(b)(3) does not apply to a prosecutor's files in subsequent civil litigation. Abdell v. The City of New York, 2006 U.S. Dist. LEXIS 66114, *8-12 (S.D.N.Y. Sept. 14, 2006) (collecting cases). With respect to the judicially created work product doctrine articulated in Hickman v. Taylor, 329 U.S. 495 (1947), and its progeny,

7

DANY's description of the documents is insufficient to establish that the documents, in their entirety, are subject to such protection. For example, factual material, such as information obtained during interviews, would not be entitled to "core work product" protection, even if it was contained in a document that also reflected attorney mental processes. Id. at *20-23. Consequently, the documents should be produced for *in camera* review by the Court, in order to determine if portions of the documents must be produced to plaintiffs.

DANY has also alleged that many documents are sealed pursuant to state law. It is clear that federal law governs discovery in section 1983 cases, and state statutes do not bar this Court from ordering production of the subpoenaed documents to plaintiffs. Cruz v. Kennedy, 1997 U.S. Dist. LEXIS 23012 (S.D.N.Y. Dec. 19, 1997); King v. Conde, 121 F.R.D. 180, 187 (E.D.N.Y. 1988).

DANY has alleged that many documents are not relevant to plaintiffs' claims. This is plainly wrong under broad relevance standard of F.R.Civ.P. 26(b)(1): "reasonably calculated to lead to the discovery of admissible evidence." Furthermore, DANY has failed to acknowledge that the scope of discovery here is governed by relevance to plaintiffs' Monell claim, and has instead attempted to narrow scope to the facts surrounding plaintiffs' individual arrests.

Finally, DANY asserts – without any basis in fact – that "plaintiffs are on a fishing expedition seeking information about potential new plaintiffs to add to the litigation." (Memorandum of Law in Support of Motion to Quash ("Memorandum of Law") at p. 17, ¶31.) This is simply false. As set forth more fully below, at this stage of the litigation, plaintiffs do not object to redaction of names, addresses, and telephone numbers of non-plaintiff arrestees from the documents – the documents can be produced while protecting the identities of the non-

plaintiff arrestees.

## ARGUMENT

**Point I:    The Official Corruption Unit Investigation Documents Must be Produced or Submitted for *In Camera* Inspection by the Court.**

DANY has withheld the entire Official Corruption Unit investigation file. Plainly, many documents in that file should be produced to plaintiffs. According to A.D.A. Kermani's Affirmation in support of the motion to quash ("Affirmation"), the Official Corruption Unit conducted an "investigation into the facts surrounding the arrests by the Manhattan South Vice Enforcement Squad of a number of men (not exclusively plaintiffs) for prostitution." (Affirmation at ¶8.) The investigation "specifically targeted New York City undercover police officers #3371 and #31107 when it conducted its investigation concerning the arrests by the Manhattan South Vice Enforcement Squad to determine and assess whether these undercover police officers had committed any crimes in connection with these arrests." (Memorandum of Law at p. 18, ¶35.) These two undercover police officers, UC#3371 and UC#31107, are the officers who alleged that the four plaintiffs in these civil rights cases engaged in prostitution. According to a statement released by the Communications Director for Manhattan District Attorney Cyrus R. Vance, Jr., "the investigation did result in the dismissal of several related cases." (Exhibit C to Spiegel Decl.)

DANY first claims that the "File as a Whole is Sealed" pursuant to New York State Criminal Procedure Law §§ 160.50 and 1.20. (Memorandum of Law at p. 19, ¶37.) DANY also alleges that certain documents within the file are sealed pursuant to the same state statutes. This argument is unavailing, because in federal civil rights cases, "issues of privilege are governed by

9

federal, not state, law." Cody v. N.Y.S. Div. of State Police, 2008 U.S. Dist. LEXIS 59095, *6

(E.D.N.Y. July 31, 2008). As Judge Weinstein has explained in an earlier case,

> state rules protecting state officers must always be viewed with caution because they may be parochially designed to thwart federal interests:
>
>> It obviously would make no sense to permit state law to determine what evidence is discoverable in cases brought pursuant to federal statutes whose central purpose is to protect citizens from abuses of power by state and local authorities. If state law controlled, state authorities could effectively insulate themselves from constitutional norms simply by developing privilege doctrines that made it virtually impossible for plaintiffs to develop the kind of information they need to prosecute their federal claims.

King v. Conde, 121 F.R.D. 180, 187-188 (E.D.N.Y. 1988) (quoting Kelly v. City of San Jose, 114 F.R.D. 653, 656 (N.D.Cal. 1987)).

The Official Corruption Unit documents withheld by DANY are described as

> a. One list of 19 defendants' names (three of whom are plaintiffs Richardson, Daniels and Crosby), their arrest numbers and dates of birth;
>
> b. Nineteen criminal case papers, one set for each of the above referenced defendants (however, the case papers relating to plaintiffs' closed case files have been produced to the extent discussed [earlier in the Memorandum of Law];
>
> c. Three newspaper clippings;
>
> d. Three fax coversheets and one memorandum to the file.

(Memorandum of Law at p. 18, ¶36.)

     A. The List of Nineteen Names and the Corresponding Case Files

These documents are relevant to plaintiffs' Monell claims, and to the credibility of defendants UC#3371 and UC#31107. The charges in all nineteen cases were ultimately dismissed (or disposed of by pleas to non-criminal non-prostitution-related violations) and

sealed. (Memorandum of Law at p. 19, ¶40.) The fact that they were dismissed or ended with non-criminal non-prostitution-related dispositions makes them relevant to plaintiffs' Monell claim, as discussed above. The case files will also detail the defendants' false allegations, and will reveal whether they are formulaic or otherwise bear on their credibility.

Although DANY has attempted to shield these nineteen case files from production, it has already released similar kinds of information from the parallel Trial Division investigation. Specifically, DANY has produced numerous NYPD Complaint Follow Up Reports from that investigation.[4] The Complaint Follow Up Reports are first-person narratives of prostitution arrests by the same undercover officers who arrested plaintiffs. (Memorandum of Law at p. 13, ¶20(c); Exhibit J to Spiegel Decl.) The eighteen released Trial Division documents are also from sealed criminal case files, but DANY simply redacted personal information of the arrestees before releasing them in this litigation – the same practice could be followed with respect to the Official Corruption Unit files. DANY has arbitrarily asserted that the Official Corruption Unit investigation file is sealed (because it did not result in charges against the two undercover officers) and that the Trial Division file is not sealed, even though exactly the same kind of document is involved, i.e., documents detailing the allegations against arrestees by UC#3371 and UC#31107.

There is no valid distinction between the eighteen documents which have been released

---

[4]Plaintiffs have not attached any of the Complaint Follow Up Reports for non-plaintiff arrestees, to protect their privacy. Exhibit J to Spiegel Decl. consists of the Complaint Follow Up Reports for the four plaintiffs, so that the Court can see the kind of information contained in this type of document. Plaintiffs will produce the non-plaintiff Complaint Follow Up Reports to the Court separately, if requested to do so, or the Court will be able to examine them if *in camera* inspection is ordered.

from the Trial Division investigation, and the "nineteen criminal case papers" contained in the Official Corruption Unit investigation file, since all of them are sealed pursuant to the same state statutory provisions.  Typically, criminal case files contain DA Data Sheets, Complaint Follow Up Reports, Criminal Court sworn accusatory instruments and "Supporting Depositions," all of which contain statements by the arresting officers.  The files also contain the criminal history records of the arrested men, and "CJA sheets," which would contain information relevant to a pattern of arresting men who had never been arrested previously, who were gainfully employed, who were homeowners, etc. (Spiegel Decl. at ¶17.)  Because DANY does not adequately describe the documents contained in the "nineteen criminal case papers" being withheld, plaintiff cannot know whether additional documents in the files may also be relevant.

At this stage of the litigation, plaintiffs would not object to the redaction of individual arrestees' names, addresses and telephone numbers, but otherwise, all of the documents and all information (such as birthdates or age information, occupations, information concerning prior arrests, home ownership, etc.) should be released.

      B.   Three Fax Cover Sheets

These sheets contain information regarding potential witnesses who either sent information concerning the investigation to DANY, or received information concerning the investigation from DANY.  Plaintiff should be permitted to discover the identities of those witnesses, and be permitted to depose them.  Similar fax cover sheets were produced from the Trial Division investigation file, so the only objection asserted to releasing these fax cover sheets is that the entire Official Corruption Unit file is sealed pursuant to state law. (Memorandum of Law at p. 13, ¶20(d).)

     C.  The DANY Memorandum on the Results of the Official Corruption Unit Investigation

DANY describes the DANY Memorandum as "a legal analysis of the validity of the arrests of a number of men for prostitution." (Memorandum of Law at p. 19, ¶41.) While couched as a "legal analysis," simply describing it as such does not mean that it contains only legal conclusions. The mere fact that the Memorandum may "contain[] the opinion, impression and conclusion of the assigned investigative ADA" does not mean that there is blanket protection from disclosure. Abdell v. The City of New York, 2006 U.S. Dist. LEXIS 66114, *12-14 (S.D.N.Y. Sept. 14, 2006). *In camera* inspection of the document is necessary to determine whether the Memorandum, or parts of it, should be produced to plaintiffs. Much of the document may contain material which is not entitled to work product protection, and as in Abdell, none of the policies underlying the work product doctrine are implicated in this case.

Furthermore, the Memorandum contains the conclusions of "DANY's Official Corruption Unit's investigation into the facts surrounding the arrests by Manhattan South Vice Enforcement Squad of a number of men (not exclusively plaintiffs) for prostitution." (Affirmation at ¶8.) According to DANY, "the Official Corruption Unit . . . conducted its investigation concerning the arrests by the Manhattan South Vice Enforcement Squad to determine and assess whether these undercover police officers had committed any crimes in connection with these arrests." (Memorandum of Law at p. 18, ¶35.) As such, the Memorandum, or portions of it, would be admissible under Fed. R. Evid. 803(8)(C) as a report of "factual findings resulting from an investigation made pursuant to authority granted by law." Gentile v. The County of Suffolk, 926 F.2d 142 (2d Cir. 1991).

In Gentile, plaintiffs brought section 1983 claims, including a Monell claim, arising from

13

their arrest and prosecution. Shortly before trial of the federal civil rights action, a state commission released a report of an investigation into the police department defendant, and the trial court admitted portions of the report into evidence under Rule 803(8)(C).

> Indeed, prevailing law on this issue indicates that admissibility of evidence of this sort is generally favored. *See* Rule 803(8)(C) of the Fed. R. Evid. Reports such as those issued by the Commission are presumed to be "admissible in the first instance," Masemer v. Delmarva Power and Light Co., 723 F. Supp. 1019, 1021 (D. Dela. 1989), and the "party opposing the introduction of a report bears the burden of coming forward with enough 'negative factors' to persuade a court that a report should not be admitted." Id., citing Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 167 (1988). This presumption of admissibility extends not merely to factual determinations in the narrow sense, but also to conclusions or opinions that are based upon a factual investigation. Beech Aircraft Corp. v. Rainey, 488 U.S. at 170.

Id. at 148; Miranda-Ortiz v. Deming, 1998 U.S. Dist. LEXIS 17147 (S.D.N.Y. Oct. 29, 1998). Whether or not the Memorandum is ultimately admissible at trial, it is discoverable as relevant to plaintiffs' Monell claim.

**Point II:    The Trial Division Investigation Documents Must be Produced, Redactions to Produced Documents Must be Removed, or the Documents Must be Submitted for *In Camera* Inspection by the Court.**

A. The Documents Which Have been Produced Must Have Certain Redactions Removed

DANY has produced documents in which the birthdates and other information concerning individuals has been redacted. Plaintiffs do not object to the redaction of non-plaintiff arrestees' names, addresses and telephone numbers at this stage of the litigation, subject to a later application to obtain that information upon a proper showing. Plaintiffs *do* object to redaction of dates of birth, or ages, of the arrestees – that information, without other identifying data, would not enable a person viewing the document to determine the identity of the referenced individual. The age of the arrestees has been one of the key facts supporting the conclusion that

14

they were not, in fact, engaging in prostitution when they were arrested.  Indeed, the list of nineteen arrestees compiled by the DANY Official Corruption Unit contained their names, "their arrest numbers <u>and dates of birth</u>."  (Memorandum of Law at p. 18, ¶36(a), emphasis added.)  Obviously, the ages of the arrested men was also considered significant to the investigating Assistant District Attorney.  The documents should be produced with only the minimum necessary redactions to prevent identification of the arrestees.

   B. <u>The Withheld Documents Must be Produced to Plaintiffs, or to the Court for *In Camera* Inspection</u>

  The DANY Trial Division documents listed in the Memorandum of Law at pp. 14-15, ¶21(s) through (ee), have been withheld based upon the same claims of work product protection and state statutory sealing as discussed above concerning the Official Corruption Unit file.  The descriptions of the documents are not sufficiently detailed to permit plaintiffs to address all of the relevant material they may contain, and therefore should be provided to the Court for *in camera* inspection.

  On their face, many of the documents must be produced.  For example, lists of arrests or a "list of each prostitution case and its status" are obviously factual compilations of information, containing no "mental processes" of an attorney.  Email correspondence may contain material which is factual or otherwise not subject to work product protection.  "Prosecutor's notes from meetings with other ADAs regarding pending litigation" may contain material which must be produced.  The "NYPD Kites regarding civilian complaints as to offenses other than prostitution" are obviously relevant to the DANY investigation, or they wouldn't be in the investigation file.  An interview with "a non-party arrestee" and a memo "detailing the interview" can be redacted to

prevent identification of the person.[5]  Likewise, the "[p]rintouts of 'Defendant Details' from sealed criminal cases concerning non-party arrestees" can be redacted to protect the privacy of the individuals.

Plaintiffs respectfully request that the Court conduct an *in camera* review of this material to determine which documents, in whole or in part, should be produced to plaintiffs.

**Point III:     Documents from the Plaintiffs' Criminal Case Files**

Plaintiffs request that any documents withheld be produced to the Court for *in camera* review of this material to determine which documents, in whole or in part, should be produced to plaintiffs.

**CONCLUSION**

For all of the foregoing reasons, DANY's motion to quash should be denied in its entirety.

Dated:  New York, New York
        April 12, 2010

                                               _____s/_____
                                               MICHAEL L. SPIEGEL
                                               111 Broadway, Suite 1305
                                               New York, New York 10006
                                               (212) 587-8558
                                               Attorney for Plaintiffs

---

[5]Robert Pinter, the man who first took the story to Gay City News, was interviewed by DANY – and he is likely the person involved in the interview.  Mr. Pinter is the founder of the Coalition to Stop the Arrests!, which created the document which is Exhibit A to the Spiegel Decl.  He is also the plaintiff in Pinter v. The City New York, 09 Civ. 7841(CM)(THK).  His attorney, James Meyerson, Esq., has informed the undersigned that Mr. Pinter will provide an authorization to release any information pertaining to him in this litigation.